**COMPANIA DE NAVEGACION TRANS-MAR, S. A., v. GEORGIA HARD-WOOD LUMBER CO.**

**THE KOTOR.**

No. 10796.

Circuit Court of Appeals, Fifth Circuit.

April 5, 1944.

Wilbur E. Dow, Jr., of New York City, and Joseph B. Cumming, of Augusta, Ga., for appellant.

John Tilney Carpenter, of New York City, and James M. Hull and J. J. Willingham, both of Augusta, Ga., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit by libel in personam was for $9,304 freight money on pine timbers weighing 531,656 pounds or 265.82 tons, at $35 per ton, from Jacksonville, Florida, to Alexandria, Egypt. The claim was that libellant and respondent had agreed that libellant should carry "750,000 board feet of pine timbers, not exceeding four pounds per board foot, at $70.00 per 1000 feet", or $35 per short ton; that instead of 4 pounds, the timbers libellant had carried had averaged 4.75 per pounds per board foot; the shipment as a whole had weighed 531,656 pounds in excess of the guaranteed weights; and respondent had not paid libellant for the carriage of this excess weight to its damage in the sum sued for.

The respondent admitted: that the contract was as pleaded; that the respondent did load the timbers on the vessel; and that libellant did transport them as alleged. It denied, though, that respondent had loaded, and libellant had carried, any excess weight; and put libellant on its proof.

On the trial it was established: that the contract was made as pleaded; that the timbers were purchased and shipped from different points throughout Florida, Alabama, and Mississippi, 75 percent coming from Century and Gulf Hammock, Florida, and Brewton, Alabama; and that most of them had been water stored, i. e., had been in mill ponds from two months to a year. This fact of water storage and the possible or probable subsequent drying out of the timbers was permitted to dominate and give direction to the case.[1]

The District Judge, of the opinion that the evidence of the amount of drying and loss of weight that would occur was sufficient to overcome the effect of libellant's proof by the offer of the railroad weights, thought that libellant had failed to sustain its burden of showing that the shipment was overweight when received on the ship. He, therefore, decided against libellant and dismissed the libel.

Libellant is here insisting that the judgment be reversed. Respondent, insisting

[1] There was testimony showing that: hoisted aboard flat-cars, the Century and Brewton lots were carried from 40 to 60 miles by rail to Pensacola, the Gulf Hammock to Dunnellon, and there weighed the day after they were loaded, some 24 to 48 hours after leaving the water, they were carried thence to Jacksonville, a distance of 340 miles from Pensacola and 100 miles from Dunnellon. The cars arrived at various railroad yards in Jacksonville between Nov. 19th and Dec. 1st, in an average of 4.3 days after they were weighed. Of the 38 cars of the Century lot, 25 arrived between Nov. 19th and Nov. 23rd, 11 on the 27th, and one on Dec. 1st; two of the three Brewton cars arrived on the 27th and the third on the 1st. The Gulf Hammock car arrived on Nov. 26th. The Kotor docked on Nov. 26th, and began loading on the morning of the 27th. The cars were moved from the yards to the wharf and the timbers were loaded directly onto the ship. Approximately 10 cars were loaded a day and all of them discharged by Dec. 1st. The maximum period of sixteen and an average period of 10 days elapsed from the time the first car was weighed until the last car was loaded on the vessel. When weighed by certified railway weighing masters, the timbers averaged 4.75 pounds to the board foot. The weights were entered on the railroad bills of lading which showed in addition that the carload lots ranged on an average from 4.3 to 5.23 pounds per board foot. When after remaining in the yards from one to five days the timbers were loaded aboard the ship, the bills of lading were delivered to libellant. The weather throughout the section was extremely humid, particularly at Jacksonville, where it rained every day but two from the time the first car arrived until the last car was loaded aboard the ship. When some of the cars first arrived and libellant's agent learned that the weight of the timber was running heavy, he advised respondent, its agent came down, and controversy arose. Libellant's agent suggested that sample cars be weighed, respondent's agent objected to weighing sample cars and insisted that all the cars be weighed. Libellant's agent objected on the ground that it would cause too much delay in loading the ship. There was testimony that a test weight could be obtained by weighing sample cars and libellant's expert testified that he had never known of the practice of weighing timbers at a port after they had been weighed at an interior point where it was customary to weigh them. It was testified that when water stored timbers are taken out of the water they weigh a little more than green timber. Seasoned timber weighs less than green or water seasoned. The average weight of green timbers of the size of those in this case is 4½ pounds. It would take at least a year to sun dry green timbers to bring them down to the 3.6 pounds per board foot of such timbers; water stored timbers taken out of the water would be considered dried in four to six months. The extent or amount of loss of moisture content of green or water seasoned timber depends on conditions and varies from time to time. When water stored timber is taken out of water, its moisture content has a tendency to equalize with the atmospheric conditions. Heat has very little to do with its equalizing. Wind is much better than sunshine. Circulation is the principal drying quality. There was testimony of witnesses that in their opinion the timber would lose weight between the time it was weighed and the time it reached Jacksonville, ten, twelve to fifteen per cent., according to which estimates, if accepted, the timber would have had an average weight of .31 pounds over the guaranteed weight.

that the judgment is supported by the evidence and may not be reversed, moves to dismiss the appeal because not timely applied for.[2]

■ The point as to our jurisdiction is quite a serious one. Because, as expressly provided in Rule 81(a) (1), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, do not apply, in admiralty, appellate jurisdiction in admiralty depends upon substantial compliance with 28 U.S.C.A. § 230. This provides:

"No writ of error or appeal intended to bring any judgment or decree before a circuit court of appeals for review shall be allowed unless application therefor be duly made within three months after the entry of such judgment or decree."

In Alaska Packers Ass'n v. Pillsbury, 301 U.S. 174, 57 S.Ct. 682, 81 L.Ed. 988, decided before the adoption of the new Federal Rules, the United States Supreme Court held that a rule of the Circuit Court of Appeals, which substituted notice for an application for and allowance of an appeal, was invalid, and that an appeal from a final judgment not applied for within the ninety days was invalid. In The Fanny D, 112 F.2d 347, the Fifth Circuit, and in Blaske v. Dick, 126 F.2d 96, the Seventh Circuit held that an appeal from an interlocutory decree in admiralty must be applied for and allowed within the fifteen days fixed by statute, and that the ninety days' period fixed in the Civil Rules was not applicable.

Appellee relies upon the holding of these decisions that the statutory requirement that an application for appeal must be made within the time fixed is not a technicality which can be waived. He relies, too, on decisions like Ross v. White, 6 Cir., 32 F.2d 750; Camden Iron Works v. City of Cincinnati, 6 Cir., 241 F. 846; and others decided on appeals other than in admiralty, before the new rules went into effect, that the mere filing with the clerk of an application for or notice of appeal not presented to the judge cannot be construed as a properly filed application. As to the nunc pro tunc order of the District Judge, appellee points out that if it was made at a time when the court, for want of an application timely filed, had lost jurisdiction, the judge could not, by calling his order a nunc pro tunc one, confer on himself a jurisdiction which had already been lost.

Appellant concedes that if the notice of appeal it filed and the action taken by the judge in fixing the bond within the ninety days cannot be treated as an application for appeal, the application later filed and the orders of the judge would be unavailing. It insists though that what it did must be regarded as an application for appeal, and it points to the authorities holding that if an application is timely filed, the order granting the appeal may be made after the time has expired. Of the Alaska case, it argues: that there was no order there allowing the appeal, the rule having undertaken to do away with the necessity for an order by providing that an appeal could be taken by simply giving notice; that all that was held in that case was that that

---

[2] This is the record: On April 20, 1943, a final decree dismissing the libel was entered, and appellant did not within the 90 days from that date fixed by statute formally apply for and obtain the allowance of an appeal. Instead, on July 6, it issued, served on, and obtained the acceptance of respondent's proctors of, a notice of appeal, which notice on July 12th it filed in the office of the Clerk of the District Court, at which time proctors for libellant consulted the district judge on the amount of the appeal bond. This, fixed at $250.00, was executed in New York on July 16, and with assignment of errors, was mailed to and filed with the clerk on July 21st. On Aug. 6th, libellant prepared and swore to a formal petition for appeal, filed it on Aug. 12th, and on August 13th, obtained an order of allowance. On Aug. 30, the district judge signed and filed an order that the libellant be allowed an appeal nunc pro tunc as of July 12, 1943, the order reciting that it had been assumed by the proctors for libellant, now appellant, that the clerk of the court would present the notice to the judge for allowance of appeal, and that because of this reliance there is not in the record any allowance of this appeal prior to the order of Aug. 13. The order also recited that the district judge learned during the 90 day period of the intention of appellant to appeal from the decree and had not indicated any intention to disallow the same, and undoubtedly would have allowed it if and when so requested, though he was of the opinion that under rule 10(1) (Appeals in Civil Action) and rule 12 (Appeals in Admiralty), last paragraph (Appeals in Admiralty are otherwise covered by the general rules of the court) of the United States Circuit Court of Appeals for the Fifth Circuit, formal allowance was no longer necessary.

rule was not valid and that the statute requiring application and allowance must be complied with. As to the Fanny D and the Blaske cases, supra, it points out that there the decision was not that a notice under the new rules if timely made could not be taken as an application for an appeal. It was that an interlocutory appeal in admiralty required to be taken within fifteen days could not be taken later.

Appellant, invoking cases like Brandies v. Cochrane, 105 U.S. 262, 26 L.Ed. 989; United States v. Beaman, 5 Cir., 61 F.2d 493; The Ruth, 3 Cir., 20 F.2d 314; United States v. Todar, 7 Cir., 41 F.2d 146; Donaldson v. Baltimore Acc. Corp., 3 Cir., 38 F.2d 215; where it is held that if the application is timely filed, the allowance may be made later, puts its final allowance on cases like R. F. C. v. Prudence Group, 311 U.S. 579, 61 S.Ct. 331, 85 L.Ed. 364; Crump v. Hill, 5 Cir., 104 F.2d 36; Baxter v. Savings Bank, 5 Cir., 92 F.2d 404; Wilson v. Alliance Life, 5 Cir., 102 F.2d 365; which hold in effect that it would be "a harking back to the formalistic rigorism of an earlier and outmoded time, as well as a travesty upon justice" to deprive a litigant of his right to appeal merely because, though it plainly appeared that he was intending to, and thought he was doing what was necessary to, appeal, he took his steps informally instead of formally.

We agree with appellant. It is quite plain that it was endeavoring to appeal. That the judge and everyone else concerned thought it was effectively appealing, the record leaves in no doubt, and but for the language of the opinion in the Alaska case, which, though not directly in point, is disturbing, we should not hesitate to hold: that what appellant did amounted to a timely application to appeal; that it was granted; that the appeal was perfected; and that our jurisdiction became established. It is quite clear that it does not at all advance the cause or the appearance of justice to deny to what appellant did the legal effect it was designed to achieve. We think that R. F. C. v. Prudence Group and the other cases cited above warrant our taking jurisdiction and denying the motion to dismiss.

On the merits, we think it clear that appellant is right. The evidence of the rail weights was sufficient unless overthrown to entitle libellant to judgment. In the face of the positive rail weights obtained and furnished by the respondent, it was not sufficient for respondent to offer opinion testimony of the vague and unsatisfactory nature of that offered. This is especially true not only because this evidence taken as a whole lacks convincingness but because it shows not that there was not, but that there was, some excess weight. This does not mean that the opinion testimony that the timbers would dry and had to some extent dried must be wholly rejected. It does mean, though, that taking the record as a whole, the judge's view of it, that the effect of the offer of the railroad weights establishing excess weight had been entirely overthrown, is not a sound one.

The motion to dismiss the appeal is denied, the judgment is reversed, and the cause is remanded for further and not inconsistent proceedings.